## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

ERIOLA ARAPI, a U.S. Citizen,

   10354 Jade Forest
   Saint Louis, MO 63123

   Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

Serve:  Office of the General Counsel
        Department of Homeland Security
        Mail Stop 3650
        Washington, D.C. 20528

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

Serve:  U.S. Citizenship & Immigration
        Services
        425 I. Street, N.W., Room 6100
        Washington, D.C. 20536

UNITED STATES DEPARTMENT OF
STATE,

Serve:  Executive Office
        Office of the Legal Adviser
        Suite 5.600
        600 19th St. NW
        Washington, DC 20522

U.S. EMBASSY, Tirana, Albania,

Serve:  Executive Office
        Office of the Legal Adviser
        Suite 5.600
        600 19th St. NW
        Washington, DC 20522

Case No.  1:19-cv-3539

KEVIN MCALEENAN, Secretary of the
Department of Homeland Security,

Serve:  Office of the General Counsel
        Department of Homeland Security
        Mail Stop 3650
        Washington, D.C. 20528

KENNETH T. CUCCINELLI, Director of the
United States Citizenship and Immigration
Services,

Serve:  U.S. Citizenship & Immigration
        Services
        425 I. Street, N.W., Room 6100
        Washington, D.C. 20536

MICHAEL POMPEO, United States Secretary
of State,

Serve:  Executive Office
        Office of the Legal Adviser
        Suite 5.600
        600 19th St. NW
        Washington, DC 20522

and;

LEYLA MOSES-ONES, Chargé d'Affaires of
the United States at the U.S. Embassy, Tirana,
Albania

Serve:  Executive Office
        Office of the Legal Adviser
        Suite 5.600
        600 19th St. NW
        Washington, DC 20522

   Defendants.

**COMPLAINT**

Plaintiff Eriola Arapi asserts her cause of action against Defendants U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, U.S. Department of State, the U.S. Embassy in Tirana, Albania, Kevin McAleenan, Kenneth T. Cuccinelli, Michael Pompeo, and Leyla Moses-Ones as follows.

1.      Plaintiff Eriola Arapi is a citizen of the United States, and a native of Albania.

2.      Plaintiff's father, Saimir Malushi, is a citizen and current resident of Albania.

3.      Albania is a predominantly Muslim country.

4.      Plaintiff Eriola Arapi currently lives in the United States.

5.      Plaintiff Eriola Arapi filed an I-130 petition for alien relative on behalf of her father, Saimir Malushi. As the father of an adult U.S. Citizen, Mr. Malushi is classified as the immediate relative of a U.S. citizen.

6.      The I-130 filed by Ms. Arapi on behalf of Mr. Malushi was approved. It was forwarded to the U.S. Department of State for visa processing on April 18, 2017.

7.      Mr. Malushi appeared for his visa interview at the U.S. Embassy in Tirana, Albania on October 5, 2017.

8.      On December 26, 2017, the Department of State denied Mr. Malushi's immigrant visa, on the erroneous basis that his conviction, in 1984, for "Deliberately Light Injury" was a crime involving moral turpitude.

9.      On January 22, 2018, Ms. Arapi and Mr. Malushi filed an I-601 waiver application with USCIS in an attempt to overcome the alleged ground of inadmissibility. The waiver application stated that, because the conviction in question was analogous to simple

assault, it was not a crime involving moral turpitude and Mr. Malushi was thus not inadmissible. The waiver application went on to state that, even if the conviction was for a crime involving moral turpitude, Mr. Malushi met the applicable standard for a waiver - namely that at least 15 years had passed since the activity or event that made him inadmissible, he has been rehabilitated, and his admission to the United States is not contrary to the national welfare, safety or security of the United States.

10.     After this application had been pending for 14 months, U.S. Citizenship and Immigration Services issued a request for evidence. In addition to the initial crime involving moral turpitude ground of inadmissibility, USCIS further alleged, erroneously, that Mr. Malushi's conviction in communist-era Albania for deliberately light injury was a "violent or dangerous crime" and that therefore this case warranted the heightened standard, requiring the showing of extraordinary circumstances, such as "one involving national security or policy considerations" or "if the denial of your admission would result in exceptional and extremely unusual hardship.

11.     Plaintiff and Mr. Malushi responded to this request for evidence on June 12, 2019.

12.     On October 24, 2019, over two years from the date of Mr. Malushi's embassy interview, nearly two years from the date of the filing of the I-601 waiver, and over four months from the date of the response to the request for evidence, USCIS denied the application for a waiver.

13.     The Department of State has made a final decision that Mr. Malushi is inadmissible, and USCIS has made a final decision to deny his application for a waiver of that ground of inadmissibility. .

14.    The Plaintiff has no further remedies to pursue.

15.    The Plaintiff seeks judicial review under the Administrative Procedures Act of the denial of Mr. Malushi's applications for an immigrant visa and for a waiver of any applicable grounds of inadmissibility, and an order that those applications be approved. Ms. Arapi also asks the Court to declare that Defendants' decision violated the Administrative Procedure Act because it was arbitrary and capricious.

## PARTIES

16.    Plaintiff Eriola Arapi is a citizen of the United States.

17.    Plaintiff's father Saimir Malushi is a citizen of Albania, currently residing in Albania.

18.    Defendant Department of Homeland Security (hereinafter sometimes referred to as "the DHS") is the agency of the United States that is responsible for implementing the petition for alien relative provisions of the law and assisting the DOS with background and security checks.

19.    Defendant United States Citizenship and Immigration Services (hereinafter sometimes referred to as "the USCIS") is the component of the DHS that is responsible for processing petitions filed on behalf of alien relatives seeking to file spouse visa applications, as well as applications for waivers of grounds of inadmissibility.

20.    Defendant Department of State (hereinafter sometimes referred to as "the DOS") is the agency of the United States that is responsible for communicating with the DHS and managing Defendant Embassy of the United States in Tirana, Albania, and which is responsible for implementing the immigrant visa provisions of the law.

21.    Defendant Embassy of the United States in Tirana, Albania (hereinafter sometimes referred to as "the Tirana Embassy") is a component of the DOS that is responsible for processing immigrant visa applications and implementing the immigrant and non-immigrant visa provisions of the law.

22.    Defendant Kevin McAleenan, the Secretary of the DHS, is the highest ranking official within the DHS.  McAleenan, by and through his agency for the DHS, is responsible for the implementation of the Immigration and Nationality Act (hereinafter sometimes referred to as "the INA"), and for ensuring compliance with applicable federal law, including the Administrative Procedures Act (hereinafter sometimes referred to as "the APA").  McAleenan is sued in his official capacity as an agent of the government of the United States.

23.    Defendant Kenneth T. Cuccinelli, Director of the USCIS, is the highest ranking official within the USCIS.  Cuccinelli is responsible for the implantation of the INA and for ensuring compliance with all applicable federal laws, including the APA.  Cuccinelli is sued in his official capacity as an agent of the government of the United States.

24.    Defendant Michael Pompeo, the U.S. Secretary of State, is the highest ranking official within the DOS.  Pompeo is responsible for the implementation of the INA and for ensuring compliance with applicable federal laws, including the APA.  Pompeo is sued in his official capacity as an agent of the government of the United States.

25.    Defendant Leyla Moses-Ones, the Chargé d'Affaires of the United States at the U.S. Embassy, Tirana, Albania is currently the highest official at that Embassy.  Moses-Ones is being sued in an official capacity as an agent of the government of the United States.

## JURISDICTION AND VENUE

26.     This Honorable Court has federal question jurisdiction over this cause pursuant to 28 U.S.C. § 1331, as it raises claims under the Constitution of the United States, 28 U.S.C. §1651, and the APA, 5 U.S.C. § 500 et seq..

27.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because (1) Defendants are agencies of the United States or officers or employees thereof acting in their official capacity or under color of legal authority; (2) no real property is involved in this action, and; (3) the Defendants all maintain offices within this district.

28.     This Honorable Court is competent to adjudicate this case, notwithstanding the doctrine of consular non-reviewability, *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), because the final decision on the waiver of inadmissibility was taken by defendant USCIS.

## FACTUAL BACKGROUND

29.     In 1984, Mr. Malushi was convicted under the previous regime in Albania of "deliberately light injury," following a fight. He was sentenced to penal labor and a reduction in salary.

30.     In 2016, Mr. Malushi became the beneficiary of an I-130 Petition for Alien Relative filed by his adult daughter, Plaintiff Eriola Arapi, a United States citizen.

31.     In 2017, the I-130 filed by Ms. Arapi on behalf of her father was approved, and sent to the National Visa Center, a part of the U.S. Department of State, for further processing.

32.     On December 26, 2017, the Department of State denied Mr. Malushi's immigrant visa, on the erroneous basis that his conviction, in 1984, for "Deliberately Light Injury" was a crime involving moral turpitude.

33.     On January 22, 2018, Ms. Arapi and Mr. Malushi filed an I-601 waiver application with USCIS in an attempt to overcome the alleged ground of inadmissibility. The waiver application stated that, because the conviction in question was analogous to simple assault, it was not a crime involving moral turpitude and Mr. Malushi was thus not inadmissible. The waiver application went to state that, even if the conviction was for a crime involving moral turpitude, Mr. Malushi met the applicable standard for a waiver - namely that at least 15 years had passed since the activity or event that made him inadmissible, he has been rehabilitated, and his admission to the United States is not contrary to the national welfare, safety or security of the United States.

34.     After this application had been pending for 14 months, U.S. Citizenship and Immigration Services issued a request for evidence. In addition to the initial, erroneous, application of the crime involving moral turpitude ground of inadmissibility, USCIS further alleged, erroneously, that Mr. Malushi's conviction in communist-era Albania for deliberately light injury was a "violent or dangerous crime" and that therefore this case warranted the heightened standard, requiring the showing of extraordinary circumstances, such as "one involving national security or policy considerations" or "if the denial of your admission would result in exceptional and extremely unusual hardship."

35.     In June, 2019, Mr. Malushi responded to this Request for Evidence.

36.     On October 24, 2019, Mr. Malushi's application for a waiver was denied.

37.     The Denial made no effort to explain why this was a "violent or dangerous crime" and no definition of that category exists in the relevant statutes or regulations. The Administrative Appeals Office of USCIS has held that this is not analogous to the "Crime of

Violence" category of aggravated felony, and has instead applied the ordinary meaning of the words "violent" and "dangerous."  As quoted by the AAO, "Black's Law Dictionary (9th ed. 2009), for example, defines violent as 1) "[ o ]f, relating to, or characterized by strong physical force," 2) "[r]esulting from extreme or intense force," or 3) "[v]ehemently or passionately threatening." It defines dangerous as "perilous, hazardous, [or] unsafe," or "likely to cause serious bodily harm."" Matter of D-C-H-, ID# 491133 (AAO Sept. 22, 2017). While this was a non-precedent decision, it has been applied consistently by the AAO in similar cases surrounding applications for waivers of inadmissibility, and clearly does not apply to a conviction for "deliberately *light* injury" [italics added].

38.     Mr. Malushi's conviction was not a crime involving moral turpitude. Even if it was a crime involving moral turpitude, it was not a violent or dangerous crime, by USCIS' own definition.  The appropriate standard by which Mr. Malushi's waiver case should be adjudicated, if a waiver is indeed necessary, is that he has been rehabilitated and is not a threat to the national security of the United States. At no point in the more than two years that this case has been pending has the Department of State or USCIS made the contention that Mr. Malushi does not meet these criteria.

39.     The Denial Notice makes the conclusory and erroneous statements that Mr. Malushi committed a crime involving moral turpitude, and that that crime was a particularly violent or dangerous one.

**FACTUAL BACKGROUND**

*Controlled Application Review and Resolution Program*

30.     In April 2008, USCIS created CARRP, an agency-wide policy for identifying,

processing, and adjudicating immigration application that raise "national security concerns."

31.     Upon information and belief, prior to CARRP's enactment, USCIS simply delayed the adjudication of many immigration applications that raised possible "national security concerns," in part due to backlogs created by the FBI Name Check.

32.     Congress did not enact CARRP, and USCIS did not promulgate it as a proposed rule with the notice-and-comment procedures mandated by the APA.  See 5 U.S.C. § 553(b)-(c).

33.     Since CARRP's inception, USCIS has not made information about CARRP available to the public, except in response to Freedom of Information Act ("FOIA") requests and litigation to compel responses to those requests. In fact, the program was unknown to the public, including applicants for immigration benefits, until it was discovered in litigation challenging an unlawful denial of naturalization and then through the government's response to a FOIA request.

34.     CARRP directs USCIS officers to screen immigration application—including application for asylum, visas, lawful permanent residency, and naturalization—for "national security concerns."

35.     If a USCIS officer determines that an application presents a "national security concern," it takes the application off a "routine adjudication" track and—without notifying the applicant—places it on a CARRP adjudication track where it is subject to procedures and criteria unique to CARRP that result in lengthy delays and prohibit approvals, except in limited circumstances, regardless of an applicant's statutory eligibility.

*CARRP's Definition of a "National Security Concern"*

36.     According to the unauthorized CARRP definition utilized by Defendants, a "national security concern" arises when "an individual or organization [that] has been

determined to have an articulable link"—no matter how attenuated or unsubstantiated—"to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act." Those sections of the INA make inadmissible or removable any individual who, inter alia, "has engaged in terrorist activity" or is a member of a "terrorist organization."

37.     For the reasons described herein, an individual need not be actually suspected of engaging in any unlawful activity or joining any forbidden organization to be branded a "national security concern" under CARRP.

38.     CARRP purportedly distinguishes between two types of "national security concerns": those ostensibly involving "Known or Suspected Terrorists" ("KSTs"), and those ostensibly involving "non-Known or Suspected Terrorists" ("non-KSTs").

39.     USCIS automatically considers an applicant a KST, and thus a "national security concern," if his or her name appears in the Terrorist Screening Database ("TSDB") (also referred to as the Terrorist Watch List). USCIS, therefore, applies CARRP to any applicant whose name appears in the TSDB, regardless as to whether they actually belong on the list.

40.     Upon information and belief, the TSDB includes as many as one million names, many of whom present no threat to the United States.

41.     The government's recently disclosed criteria for watchlist nominations, known as the Watchlisting Guidance, impermissible allows non-U.S. citizens, including LPRs, to be listed in the TSDB even where the government does not have "reasonable suspicion" of involvement with terrorist activity.

42.     The Guidance permits the watchlisting of non-citizens and LPRs simply for being

associated with someone else who has been watchlisted, even when any involvement with that person's purportedly suspicious activity is unknown.

43.     The Guidance further provides that non-citizens and LPRs may be watchlisted based on fragmentary or uncorroborated information, or information of "suspected reliability." These extremely loose standards significantly increase the likelihood that the TSDB contains information on individuals who are neither known nor appropriately suspected terrorists.

44.     To make matters worse, the Terrorist Screening Center ("TSC"), which maintains the TSDB, has failed to ensure that innocent individuals are not watchlisted or are promptly removed from watchlists.

45.     In the year 2013, the watchlisting community added 468,749 individuals to the TSDB, and the TSC rejected only approximately one percent of those nominations.

46.     In 2009, the Government Accountability Office found that 35 percent of the nominations to the TSDB were outdated, and that tens of thousands of names had been placed on the list without an adequate factual basis.

47.     The Inspector General of the Department of Justice has criticized the Terrorist Screening Center, which maintains the TSDB, for employing weak quality assurance mechanisms and for failing to remove subjects from the TSDB when information no longer supports their inclusion. Public reports also confirm that the government has nominated or kept people on government watchlists as a result of human error.

48.     The federal government's official policy is to refuse to confirm or deny give individuals' inclusion in the TSDB or provide a meaningful opportunity to challenge that inclusion.

49.     Nevertheless, individuals can become aware of their inclusion due to air travel experiences. In particular, individuals may learn that they are on the "Selectee List," a subset of the TSDB, if they have the code "SSSS" listed on their boarding passes. They may also learn of their inclusion in the TSDB if U.S. federal agents regularly subject them to secondary inspection when they enter the United States from abroad or when boarding a flight over U.S. airspace. Such individuals are also often unable to check in for flights online or at airline electronic kiosks at the airport.

50.     Where the KST designation does not apply, CARRP instructs officers to look for "indicators" of a "non-Known or Suspected Terrorist" ("non-KST") concern.

51.     These indicators fall into three categories: (1) statutory indicators; (2) non-statutory indicators; and (3) indicators contained in security check results.

52.     "Statutory indicators" of a "national security concern" arise when an individual generally meets the definitions described in Sections 212(a)(3)(A), (B), and (F), and 237(a)(4)(A) and (B) of the INA (codified at 8 U.S.C. § 1182(a)(3)(A), (B), and (F) and § 1227(a)(4)(A) and (B)), which list the security and terrorism grounds of inadmissibility and removability.

53.     However, CARRP expressly defines statutory indicators of a "national security concern" more broadly than the statute, stating "the facts of the case do not need to satisfy the legal standard U.S. ed in determining admissibility or removability" under those provisions of the INA to give rise to a "non-KST" "national security concern."  This is illegal and contrary to law.

54.     For example, CARRP specifically directs USCIS officers to look at evidence of

charitable donations to organizations later designated as financiers of terrorism by the U.S. Treasury Department and to construe such donations as evidence of a "national security concern," even if an individual had made such donations without any knowledge or any reasonable way of knowing that the organization was allegedly engaged in proscribed activity. Such conduct would not make an applicant inadmissible for a visa or lawful permanent resident status under the statute, see INA § 212(a)(3)(B), 8 U.S.C. § 1182(a)(3)(B), nor does it have any bearing on an adjustment application.

55.     "Non-statutory indicators" of a "national security concern" include "travel through or residence in areas of known terrorist activity"; "large scale transfer or receipt of funds"; a person's employment, training, or government affiliations; the identities of a person's family members or close associates, such as a "roommate, co-worker, employee, owner, partner, affiliate, or friend"; or simply "other suspicious activities."

56.     Finally, security check results are considered indicators of a "national security concern" in instances where, for example, the FBI Name Check—one of many security checks utilized by USCIS—produces a positive hit on an applicant's name and the applicant's name is associated with a national security related investigatory file. Upon information and belief, this indicator leads USCIS to label applicants "national security concerns" solely because their names appear in a law enforcement or intelligence file, even if they were never the subject of an investigation.

57.     Thus, an applicant's name could appear in a law enforcement file in connection with a national security investigation because he or she once gave a voluntary interview to an FBI agent, he or she attended a mosque that was the subject of FBI surveillance, or he or she

knew or was associated with someone under investigation.

58.     Upon information and belief, CARRP labels applicants "national security concerns" based on vague and overbroad criteria that often turn on lawful activity, national origin, and innocuous associations. These criteria are untethered from the statutory criteria that determine whether or not a person is eligible for the immigration status they seek, and are so general that they necessarily ensnare individuals who pose no threat to the security of the United States.

*Delay and Denial*

59.     Once a USCIS officer identifies a CARRP-defined "national security concern," the application is subjected to CARRP's rules and procedures that guide officers to deny such application or, if an officer cannot find a basis to deny the application, to delay adjudication as long as possible.

60.     One such procedure is called "deconfliction," which requires USCIS to coordinate with—and, upon information and belief, subordinate its authority to—the law enforcement agency, often the FBI, that possesses information giving rise to the supposed national security concern.

61.     During deconfliction, the relevant law enforcement agency has authority to instruct USCIS to ask certain questions in an interview or to issue a Request for Evidence ("RFE"); to comment on a proposed decision on the benefit; and to request that an application be denied, granted, or held in abeyance for an indefinite period of time.

62.     Upon information and belief, deconfliction not only allows law enforcement or intelligence agencies to directly affect the adjudication of a requested immigration benefit, but

also results in independent interrogations of the immigration applicant—or the applicant's friends and family—by agencies such as the FBI.

63.    Upon information and belief, USCIS often makes decisions to deny immigration application because the FBI requests or recommends the denial, not because the person was statutorily ineligible for the benefit. The FBI often requests that USCIS hold or deny an application not because the applicant poses a threat, but because it seeks to U.S. e the pending immigration application to coerce the applicant to act as an informant or otherwise provide information.

64.    In addition to "deconfliction," once officers identify an applicant as a "national security concern," CARRP directs officers to perform an "eligibility assessment" to determine whether the applicant is eligible for the benefit sought.

65.    Upon information and belief, at this stage, CARRP instructs officers to look for any possible reason to deny an application so that "valuable time and resources are not unnecessarily expended" to investigate the possible "national security concern." Where no legitimate reason supports denial of an application subjected to CARRP, USCIS officers often invent false or pretextual reasons to deny the application.

66.    Upon information and belief, if, after performing the eligibility assessment, an officer cannot find a reason to deny an application, CARRP instructs officers to first "internally vet" the "national security concern" U.S. ing information available in DHS systems and databases, open source information, review of the applicant's file, RFEs, and interviews or site visits.

67.    After conducting the eligibility assessment and internal vetting, USCIS officers

are instructed to again conduct "deconfliction" to determine the position of any interested law enforcement agency.

68.     If the "national security concern" remains and the officer cannot find a basis to deny the benefit, the application then proceeds to "external vetting."

69.     During "external vetting," USCIS instructs officers to confirm the existence of the "national security concern" with the law enforcement or intelligence agency that possesses the information that created the concern and obtain additional information from that agency about the concern and its relevance to the individual.

70.     CARRP authorizes USCIS officers to hold application in abeyance for periods of 180 days to enable law enforcement agents and USCIS officers to investigate the "national security concern." The Field Office Director may extend the abeyance periods so long as the investigation remains open.

71.     Upon information and belief, CARRP provides no outer limit on how long USCIS may hold a case in abeyance, even though the INA requires USCIS to immigration application, including for naturalization and lawful permanent residence, within 180 days of filing the application. 8 U.S.C. § 1571(b).

72.     When USCIS considers an applicant to be a KST "national security concern," CARRP forbids USCIS field officers from granting the requested benefit even if the applicant satisfies all statutory and regulatory criteria.

73.     When USCIS considers an applicant to be a non-KST "national security concern," CARRP forbids USCIS field officers from granting the requested benefit in the absence of supervisory approval and concurrence from a senior level USCIS official.

74.     In *Hamdi v. USCIS*, 2012 WL 632397, when asked whether USCIS's decision to brand naturalization applicant Tarek Hamdi as a "national security concern" affected whether he was eligible for naturalization, a USCIS witness testified at deposition that "it doesn't make him statutorily ineligible, but because he is a—he still has a national security concern, it affects whether or not we can approve him." The witness testified that, under CARRP, "until [the] national security concern [is] resolved, he won't get approved."

75.     Upon information and belief, USCIS often delays adjudication of application subject to CARRP when it cannot find a reason to deny the application. When an applicant files a mandamus action to compel USCIS to finally adjudicate his or her pending application, it often has the effect of forcing USCIS to deny a statutorily-eligible application because CARRP prevents agency field officers from granting an application involving a "national security concern."

76.     CARRP effectively creates two substantive regimes for immigration application processing and adjudication: one for those application subject to CARRP and one for all other application. CARRP rules and procedures create substantive eligibility criteria that exclude applicants from immigration benefits to which they are entitled by law.

77.      At no point during the CARRP process is the applicant made aware that he or she has been labeled a "national security concern," nor is the applicant ever provided with an opportunity to respond to and contest the classification.

78.     Upon information and belief, CARRP results in extraordinary processing and adjudication delays, often lasting many years, and baseless denials of statutorily-eligible immigration application.

## IRREPARABLE INJURY AND MANIFEST UNJUSTNESS

76.     Ms. Arapi and her father will suffer irreparable injury if his application for a waiver is not approved and his immigrant visa is not issued.

77.     Mr. Malushi is being denied the right to live in the United States with his family, including his wife, a current lawful permanent resident, and his daughter, a United States citizen, on the basis of an error by USCIS and the Department of State.

78.     There are no adequate review procedures that would allow Mr. Malushi to come to the United States. This will result in a continued separation of Plaintiff's family and represents a miscarriage of justice.

79.     Plaintiff and her father have already provided evidence to USCIS that refutes the grounds of denial listed in the Denial Notice issued to Mr. Malushi. Mr. Malushi's application was denied due to USCIS error and miscalculation. If this continues, Plaintiff and her father will be injured in a way that is not recompensable.

80.     It is manifestly unjust to force Ms. Arapi to continue to be separated from her father with no right to appeal the erroneous decision simply because USCIS and the Department of State failed to follow their own policies, and the law, and made an error in facts and law. This would have the effect of punishing Ms. Arapi for the mistakes of USCIS and the Department of State.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

81.     Ms. Arapi and her father have exhausted all her administrative remedies. There are no further administrative remedies that Plaintiff can seek.

82.     Ms. Arapi and her father have no right to appeal his decision, and the option to file a Motion to Reopen or Reconsider is not an adequate form of administrative review. Further,

such an avenue of relief does not constitute a remedy available as of right within the meaning of 8 U.S.C. §1252(d)(1), therefore Plaintiff is not required to file a Motion to Reopen or Reconsider in order to exhaust administrative remedies.

## COUNT I - ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 500 et seq.)

83.    Ms. Arapi realleges and incorporates the foregoing paragraphs as if fully set forth herein.

84.    Ms. Arapi has been aggrieved by agency action under the Administrative Procedure Act, 5 U.S.C. §§ 500 et seq.

85.    The documents and information Mr. Malushi submitted with his I-601 waiver application, and the request for evidence associated with the same application established both that a waiver of inadmissibility was unnecessary and that, even were it necessary, he met the legal standard for that waiver. .

86.    Defendants denied Mr. Malushi's I-601 application because they refused and/or failed to consider the evidence submitted by Mr. Malishi and erroneously determined that the heightened "violent or dangerous" standard applied.

87.    Defendants acted arbitrarily, capriciously, and contrary to law in violation of the Administrative Procedure Act by denying Mr. Malushi's I-601 application.

88.    CARRP constitutes final agency action that is arbitrary and capricious because it "neither focuses on nor relates to a [non-citizen's] fitness to" obtain the immigration benefits subject to its terms. *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011).

89.    CARRP is also not in accordance with law, is contrary to constitutional rights, and is in excess of statutory authority because it violates the INA and exceeds USCIS's statutory

authority to implement (not create) the immigration laws, as alleged herein.

90.     Ms. Arapi and Mr. Malushi have exhausted all administrative remedies available to them as of right.

91.     Ms. Arapi and her father have no other recourse to judicial review other than by this action.

92.     Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of her father's application for a waiver of inadmissibility and the issuance of an immigrant visa due to USCIS and Department of State error.

## COUNT II - ADMINISTRATIVE PROCEDURE ACT
## (NOTICE AND COMMENT)

94.     Ms. Arapi realleges and incorporates the foregoing paragraphs as if fully set forth herein.

95.     The Administrative Procedures Act ("APA"), 5 U.S.C. § 553, requires administrative agencies to provide a notice-and-comment period prior to implementing a substantive rule.

96.     CARRP constitutes a substantive agency rule within the meaning of 5 U.S.C. § 551(4).

97.     Defendants failed to provide a notice-and-comment period prior to the adoption of CARRP.  Because CARRP is a substantive rule promulgated without the notice-and-comment period, it violates 5 U.S.C. § 553 and is therefore invalid.

98.     Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of her father's application for a waiver of inadmissibility and the issuance of an immigrant visa due to USCIS and Department of State error.

## COUNT III - FIFTH AMENDMENT (PROCEDURAL DUE PROCESS)

99.     Ms. Arapi realleges and incorporates the foregoing paragraphs as if fully set forth herein.

100.    Plaintiff's compliance with the statutory and regulatory requirements established in 8 U.S.C. § 1159 and 8 C.F.R. § 335.3 (for adjustment of status applicants), vests in her a constitutionally protected property and liberty interest.

101.    This constitutionally-protected property or liberty interest triggers procedural due process protection.

102.    Defendants' failure to give Plaintiff a meaningful opportunity to challenge this denial violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

103.    Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of her father's application for a waiver of inadmissibility and the issuance of an immigrant visa due to USCIS and Department of State error.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Eriola Arapi respectfully requests that this Court grant the following relief:

121.    Accept jurisdiction and review of the USCIS decision to deny the application for of inadmissibility filed by Plaintiff's father Saimir Malushi;

122.    Declare that Defendants' decision violated the Administrative Procedure Act because it was arbitrary and capricious.

123.    Declare that USCIS's decision to deny the application for a waiver of inadmissibility by Plaintiff's father was unlawful, a violation of the Immigration and Nationality Act and the relevant regulations, and a violation of the United States Constitution;

124.    Order USCIS to approve the application for a waiver of inadmissibility filed by Plaintiff;

125.    Enter a judgment declaring that (a) CARRP violates the INA and its implementing regulations; the Fifth Amendment to the United States Constitution; and the APA; and (b) Defendants violated the APA by adopting CARRP without promulgating a rule and following the process for notice and comment by the public;

126.    Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from applying CARRP to the processing and adjudication of Plaintiff's immigration benefit applications;

127.    Order Defendants to rescind CARRP because they failed to follow the process for notice and comment by the public;

128.    Grant attorneys fees and costs pursuant to the Equal Access to Justice Act;

129.    Grant such other relief as may be just and reasonable.


**RESPECTFULLY SUBMITTED**

this 25th Day of November, 2019

**Hacking Law Practice, LLC**

*/s/ James O. Hacking, III*
James O. Hacking, III - MO Bar # 46728
10900 Manchester Rd., Suite 203
St. Louis, MO 63122
Phone: 314.961.8200

Email: jim@hackinglawpractice.com

ATTORNEYS FOR PLAINTIFFS